The next case is also Massimo Corporation v. Apple, 2022, 1972, 1973, 1975, and 1976. Mr. Lawson. Thank you. So, this second appeal includes the same optics and adhesion errors from the first appeal, but I'm going to focus on some unique claims that are at issue in this appeal. And these are claims directed to parallel connected detectors. Can I just ask you a – I'm not well – I don't have well in hand what's at issue in various cases. One issue we hadn't discussed in the first argument is this one to three millimeter question. What case does that – where does that arise? You see that in the first appeal, but we'll also see that in the third appeal. Okay, then I'll hold my questions to that. We may get to that in the third appeal. Okay, thank you. We will get to that. Thank you. Here you have protrusion height. You have a protrusion height issue. We do have a specific protrusion height issue with regard to certain dependent claims. Yes. Yes. And I believe, and I'm just confirming to make sure, I want to make sure I address that, but I believe that comes up in the – Oh, I apologize, Your Honor. I need to address that in this appeal because it doesn't come up in the third appeal. So I can start with that. That would be helpful. So Judge Lowy clearly knows the case better than anyone else. Apparently that is the case, and thank you. Let me start with that then before I move to the parallel detectors, if that's okay. So Massimo told the world specific protrusion heights that would provide an order of magnitude increase in signal and put those protrusion heights, those specific protrusion heights, into dependent claims that the board found obvious. And first of all, there's no dispute that none of the references, combined references, teach the claimed range. Instead, Petitioner relied on simply the knowledge of a person of skill in the art, and in particular, a consideration of what comfort, one considering comfort, what ranges that would lead a person of skill in the art to. And in 1716 and 1733, we think the board certainly erred by at least not addressing our specifications explanation of the incredible light increase, order of magnitude improvement that you received. But didn't – I mean, did you ever read – they had an – I may be confusing issues, but my recollection is they had an expert that said there's a finite number of ways you could go, and I didn't see that you refuted that proposition with your expert or otherwise. I don't know what person skilled in the art has to be to know what comfort level or whatever goes along with a particular size. It can't be very big, right? There's not a monumental range that we could be talking about here, right? So if there's a finite range and it's pretty small, your expert didn't seem to refute or disagree with their expert that there's a finite number. Under our case laws, isn't that good enough? Well, we, of course, believe our expert did rebut the testimony, but let's assume for discussion that the court disagrees. Well, I'm happy to have you show us what he did. I think that, first of all, Apple's own expert testimony was that there's a universe of potential lens designs available here. So this does not fit into the case law where there is a limited number of choices and one would simply choose one choice. There's a universe of potential designs. Also, Apple's expert relied primarily on Osaka to try to provide some opinion about what these shapes would be, but Apple's expert testified he couldn't even describe or explain the dimensions of Osaka. So we believe that that testimony is unsupported, and we know that unsupported expert testimony is not substantial evidence. And if you look at the board's opinion, which is fairly short on this issue, we just don't think that the board's opinion is supported by substantial evidence that it would have been obvious to create a protrusion with these particular protrusion heights. It's certainly in view of Apple's expert testimony that there's many options, in view of the fact that he relied on Osaka that he couldn't even describe the shape of. We think that shows it's not supported by substantial evidence. And if Your Honor has more questions. I do. That was perfect. I'm glad you asked. So it seems like, at least in IPR 1713, Dr. King's declaration cited to a patent. Is it the 513 patent? Which he then said describes a protrusion on a biological measurement device that causes a subject's tissue to deform by a depth of about 2 to 20 millimeters. Do you agree that that was also something that was being relied on with respect to this whole protrusion heights issue? I certainly don't think that constitutes substantial evidence for the fact that these particular heights would provide the benefit that the patent teaches. And I think, in particular, when the board didn't even address Apple's expert's testimony that there's a universe of potential design choices, and the fact that, in our view, he primarily relied on Osaka, and Osaka couldn't explain the dimensions there. When you have claims that provide this substantial improvement in the art, our view as an expert with those claim ranges in front of him simply provides testimony that those claim ranges would have been obvious. Especially in view of all of his other testimony, we don't think that provides substantial evidence support. Now, unless Your Honor has more questions, if I can move on to parallel data streams. So in this issue, we have some unique claims directed to parallel connected detectors, and we believe that the court should reverse the board's decision on those claims, because the board premises analysis on starting with an Aizawa embodiment that had four detectors, and choosing to add a second ring of four detectors, even though Aizawa itself already has an eight-ring embodiment of detectors. So rather than starting with Aizawa's existing embodiment with eight sensors, the board arbitrarily found a person of skill in the art to start with Aizawa's four-ring detectors, and add a second ring spaced further away from the LED. The board relied on a motivation to increase signal strength and improve power consumption, but the board ignored Apple's expert's admission that, quote, to produce the same likely waveform and do with a reduction in power from the LEDs, slight skip, there's more signal available in the region close to the center versus out at the end. So there was no dispute that the four-ring of detectors would receive less signal. The board then reasoned that connecting the second stream in parallel would compensate for the relative decrease in light that reaches the outer ring. But that's a problem created by the first step that the board said would be taken by a person of skill in the art. In other words, a person of skill in the art would add a second outer ring of detectors. Undisputed, they would receive less light. So the solution would be to connect the two rings in parallel to compensate for the decrease in light at the outer ring, provide more power, which of course would lead to other issues like noise and complexity. And so, you know, in Raynervasive, the board needs to provide a rational connection between the facts it finds and the choices it makes. And we simply think the board's analysis here, you know, starting with Aizawa, ignoring the eight-detector embodiment, adding a second farther ring further away from the LED, and then connecting it in parallel to compensate for the decrease in power, we don't think that, supported by substantial evidence, we don't think that there's a rational connection between what the board found and the choices that the board made. Wasn't there something pointed to by either the expert or the board about pointing in this regard to Mendelsohn? And there's a tape when Mendelsohn gives reasons why it would be optimal, right? Yes. Apple's expert relied on, I believe it was Mendelsohn 799. Was that Mendelsohn 2003? Well, Mendelsohn 2003 was the reference actually being used to change Aizawa. But when it came time to explain why a person of skill in the art would see a benefit to adding a second ring in Aizawa, Apple's expert relied on Mendelsohn 799, but it was undisputed that the benefits you see from Mendelsohn 799 were from individual detectors, not detectors connected in parallel. Now, Apple's expert also relied on Mendelsohn 2003. Right. He sensed where it was going to go. Our view, and we know from cases like... Why don't I just ask the question? Do you agree that Mendelsohn 2003 discloses that the two rings of detectors are each parallelly connected? Sorry, could you repeat that question?  We do agree that Mendelsohn 2003 discloses that. When it comes to Mendelsohn 2003, we know that, of course, conclusory expert testimony is not substantial evidence. We know that expert testimony that contradicts a reference is not substantial evidence. When you look at Mendelsohn 2003, and you look at Mendelsohn 2003 as a whole, what Mendelsohn 2003 is doing is performing experiments to determine whether a wider range, a larger photodetector region would be an improvement. And so he connected the detectors in two different rings in parallel, in part because the detectors were so big, they wouldn't fit in one ring like in Izawa. But he did it so he could experiment on what the impact would be if he just used one set of rings, sorry, one ring, or both sets of rings. And when you get to the conclusion of Mendelsohn, what this all points to, is Mendelsohn says in a functional, actual physiological sensor, the goal is to provide a single large area of detection. And so we don't think a person of skill in the art, starting with Izawa, who wants to improve light concentration, would first of all ignore Izawa's eight ring embodiment, and choose to start with the four, sorry, eight detector embodiment, start with the four detector embodiment, and then look to Mendelsohn, the Mendelsohn reference, to then connect the two in parallel. We just don't think that that's a reasonable interpretation of that reference. We don't think that... But you understand why this seems to be a challenge, given where our case law is on motivation to combine. I mean, we are talking about what's in the various references, there's a finite amount of choices, and there's no teaching away argument made. And so we're talking about it might have some drawbacks, it might have some pluses. It's a little different than the cases that you may want to rely on, in terms of failure to find the motivation. Well, what I would say is, you know, in particular when it comes to the parallel data streams, when you have these two different steps, I think we need to look at the board's actual analysis, and the path that it took to arrive at these claims. I mean, Massimo Speck teaches the advantage of having parallel connected detectors, and the algorithms to calculate that, and the inventive improvement from that. And so, when you're going back and starting with Aizawa, ignoring the eight detector embodiments, starting with the four detector embodiments, adding a second one farther away from the center, because you want to improve light concentration, which doesn't make much sense. And then connecting them in parallel, because there is a reference that did that for experimental purposes, that teaches that they should be used together. We think that there's not a rational connection between those facts and the board's conclusion. We don't think there's substantial evidence support for what the board did. That analysis, in our view, makes little sense. I have two housekeeping questions. Oh, sure. Do you agree that we find there's a motivation to combine the references based on improvement adhesion? There's no need to address the motivation to improve detection efficiency. I'm not sure about the answer to that question. I think there's particular claim limitations here that are necessary to be satisfied, and so I think that's why the board engaged in this analysis of having two different rings of detectors. Will you stand back up if you change your answer? I have one more. Let me get to the second one. The second one is, do you agree with Apple's argument that for IPR 1733, even if we agree that the board erred, we need to remand for the board to make a finding on other combinations of references that the board instituted but did not decide on? We agree that the board didn't reach those issues. However, as far as remand, I think you can tell from the record, because you can certainly tell from the record from the first appeal and the second appeal that there's not substantial evidence support for that conclusion, and when this court, from its own review of the record, concludes the board could not reach that decision, there's not a path given the evidence, then the proper remedy is to reverse what is in remand. If this court believes there is a path, if it's properly explained, then the proper remedy is to remand. Thank you. Thank you, counsel. We'll give you two minutes for rebuttal. Ms. Degnan? May it please the court, Lauren Degnan for Apple. Would you like me to start with the pertusions, or can I start with the parallel detectors? As you wish. Okay, so we'll start with the parallel detectors then. And the board's decision is supported by substantial evidence, and if we just look at the combination, which is Aizawa and Mendelsohn, 2003. The one of skill and the art is presumed to note both references, and Mendelsohn, 2003, has an explicit teaching that having two co-centric rings is a design improvement with respect to power consumption and signal strength. One of skill and the art, seeking to improve Aizawa would know about this benefit, and that benefit would motivate him or her to make the combination and improve the Aizawa sensor. The board cited evidence, including the teaching of the reference itself, as well as our expert, and that is substantial evidence sufficient to... And it explicitly talks about battery life. Absolutely, in that table one, Your Honor, that you noted. And so that really should be the end of this particular challenge. Substantial evidence supports the decision. Unless you have questions? With respect to the pertusions, the board made a finding that is supported by substantial evidence that there is a finite number of design choices. And the board relied on our expert, which explained that... So what's the range? I mean, I have some reservations about this issue. I think it's hard, because nothing was said, and the expert... You're right, I don't think their expert rebutted your expert saying there was a finite, but did he identify what that finite number of choices were? Right, so let me address that, because I do think that we have here is the application of KSR's design choice theory that is not the most typical. So typically you might have literally one or two, put it on the top or put it on the bottom, and you've identified very specifically a concrete number of choices. Here, our expert and the evidence shows that you can define the finite number functionally. It's based on the scale of these devices. And so Dr. Kenney explained that these devices are on the order of millimeters. And as a practical matter, there really aren't that many choices when you're talking about such a small area. But he did more. He also explained that given the competing concerns about comfort and having to still depress into the skin, that would define a finite number of choices, that one half. So tell us, did he articulate what that finite number of choices was? He did not give a specific number to it. And we would submit that under KSR, which requires us to apply a flexible approach to motivation to combine, there shouldn't be a per se rule that says you have to identify a specific number. Again, I think the evidence that the board had and then found from what you found... Well, do you think it's just inherent or common sense that we would know what the upper limit was given the choices of comfort and all of that stuff, that anyone would know that? I think that a person with a learning skill in the art would know that. And I think that's the test, not whether that's the way people would know. But what Dr. Kenney testified is that one with a skill in the art would understand there were a finite number of choices. It was not rebutted. And the board relied on that testimony, and that testimony is, in fact, substantial evidence. It is not conclusory. He explained the parameters and why. Again, citing some references showing the general scale of these wearable devices. And I take your point, Judge Prost. This is not like the other cases where you have a specific number or there's a reference that gives specific numbers for bounds. But this issue, design choices, and the finite number thereof, is a question of fact. And through the lens that we have to evaluate the sufficiency of the findings, the substantial evidence, we think the board did enough here. Was there at least a statement to the effect that it was on the order of millimeters or something like that? Is that exactly right, Your Honor? And I pulled the cites when you were asking about it so we can have them for the record. So in appendix 2425 through 2426, which is paragraph 147, our expert talks about on the order of millimeters, and he cites some corroborating evidence about the general sizes. As well, he says it again, because I think the citation you identified, appendix 3624, paragraph 64, he does also again talk about the 2 to 22 millimeters. And so this is not conclusory testimony. He is explaining why he understands the order of magnitude of these devices and the narrow range, the narrow, acceptable design choices in order to accomplish the dual functions. And so it's not conclusory evidence. And this Court has held correctly that an expert's opinion can be all that is necessary to affirm under the substantial evidence standard. If the Court has no further questions, I will speed the balance of my time. Thank you, Ms. Tegnant. The last one has two minutes. Thank you, Your Honor. Certainly we agree that there's not a finite number of choices and certainly if there are, they haven't been identified in the record. And it's important to remember that when selecting a particular height, we're talking about selecting a particular shape for the lens. And Apple's expert testified there's universal potential choices. And so there'd be a consideration under the greatest curvature theory. Where is that greatest curvature? Is it in your detector? Is it going to provide some increase in light? Now, I won't go into it. In this appeal, the argument was that overall a lens would somehow increase light or concentrate light overall. But that's something that under Apple's petitions, personal skill in the art would take into account when selecting a particular size. Also, they would take into account exclusion. And what Apple's expert testified at length was that to really understand the impact of a lens on where the light is focused and concentrated, you have to engage in a complex ray trace analysis that Apple's expert never did in this case and that he actually hadn't done before. And you would consider many different factors. The location of the detectors, the location of LED, you would consider location of corpuscles within the wrist. And all that a personal skill in the art would rely on in a process of trial and error, he called it, to arrive at a particular lens shape. And so none of that is considered by Apple's expert. We believe the testimony is conclusory, not supported, and so I will stop there. Thank you, counsel. Case is submitted.